3 F.3d 1226
 42 Soc.Sec.Rep.Ser. 213, Medicare&Medicaid Gu 41,636
MT. DIABLO HOSPITAL, Plaintiff-Appellant,
v.
Donna E. SHALALA,* Secretary of Health and Human
Services, Defendant-Appellee.
MEMORIAL HOSPITALS ASSOCIATION, Plaintiff-Appellant,
v.
Donna E. SHALALA,** Secretary of Health and
Human Services, Defendant-Appellee.
 Nos. 90-15772, 90-15857.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 26, 1993.
 
 Patric Hooper, Hooper, Lundy & Bookman, Los Angeles, CA, for plaintiff-appellant Mt. Diablo Hosp.
 Anita D. Lee, Weissburg & Aronson, Los Angeles, CA, for plaintiff-appellant Memorial Hospitals Ass'n.
 John P. Schnitker, U.S. Dept. of Justice, Washington, DC, for defendant-appellee.
 On Remand from the United States Supreme Court.
 Before: D.W. NELSON, HALL, and FERNANDEZ, Circuit Judges.
 PER CURIAM:
 
 
 1
 The Supreme Court, --- U.S. ----, 113 S.Ct. 2955, 125 L.Ed.2d 657, vacated our previous judgment and remanded this case to us for further consideration in light of Good Samaritan Hospital v. Shalala, --- U.S. ----, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). We hereby withdraw our previous opinion in this case, Mt. Diablo Hospital v. Sullivan, 963 F.2d 1175 (9th Cir.1992), and substitute this Opinion.
 
 
 2
 Mt. Diablo and Memorial Hospitals appeal from the district courts' grants of the Secretary of Health and Human Services' ("Secretary") motions for summary judgment. We consider whether the district courts erred in concluding (1) that the providers were not entitled to retroactive corrective adjustments to compensate them for the effects of those cost limits, and (2) that the Secretary's methods for determining routine cost limits for Medicare reimbursement are not arbitrary and capricious. We affirm.
 
 
 3
 * BACKGROUND
 
 
 4
 Appellants provide health care services to eligible aged and disabled persons under the Medicare program, 42 U.S.C. Sec. 1395 et seq. For the cost years at issue in this case,[1] providers were reimbursed for daily routine service costs at a rate equivalent to the lesser of the "reasonable cost" of the services or the "customary charges" for the services. Appellants challenge the methods used by the Secretary to determine the "reasonable cost" of providing routine care.
 
 
 5
 In 1972, Congress amended the Medicare Act to give the Secretary broad discretion to define reasonable costs.[2] The amendments were motivated by the desire to contain costs arising from "variations in the efficiency of operation [and] the provision of amenities in plush surroundings." H.R.Rep. No. 231, 92nd Cong., 2d Sess., reprinted in 1972 U.S.C.C.A.N. 4989, 5069 [hereinafter House Report]. Previously, providers had been reimbursed for their actual incurred costs. The new regulations excluded "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. Sec. 1395x(v)(1)(A).
 
 
 6
 In 1974, the Secretary began the yearly publication of a schedule of routine cost limits pursuant to the 1972 amendments. The schedules were based on factors the Secretary found "appropriate and practical," including types of services furnished, geographic area, and institutional size. The schedules categorized hospitals by the per capita income of the location area and by number of beds. In 1979, the Secretary began using a wage index to calculate the reasonable cost of labor. The index was based on reports of quarterly hospital wages made to the Bureau of Labor Statistics of the Department of Labor ("BLS"). The average wage for a geographic area was computed by dividing the total hospital wages paid in one year by the total number of hospital workers in the area. The index was then formulated by dividing the average local wage by the national average. The resulting index value for each area would reflect the wage level for that area relative to the national average. See Health Care Financing Administration Medicare Program; Schedule of Limits on Hospital Per Diem Inpatient General Routine Operating Costs for Cost Reporting Periods Beginning on or after July 1, 1981, 46 Fed.Reg. 33637, 33638-89 (June 30, 1981) [hereinafter 1981 Schedule of Limits ].
 
 
 7
 The BLS data was criticized for several perceived flaws, including its age and its failure to standardize for factors such as the variation in occupational mix and proportion of part-time workers. The data's effective assumption that all employees worked full-time was detrimental to areas that employed large numbers of part-time workers. Areas in which hospitals employed large numbers of part-time employees were determined to have lower costs per employee, and consequently assigned lower index values, than areas in which hospitals had the same costs but a different mix of part-time and full-time workers. Commentators also noted a distorting effect from the inclusion of federal and state hospital wage data in the index. The Secretary defended the use of the BLS data, stating that the indices employed "the most reliable data available." Health Care Financing Administration Medicare Program; Schedule of Limits on Hospital Inpatient General Routine Operating Costs for Cost Reporting Periods Beginning on or after July 1, 1980, 45 Fed.Reg. 41868, 41871 (June 20, 1980).
 
 
 8
 In 1983, Congress ordered the Secretary to conduct a study to develop a wage index that accounted for the deficiencies in the BLS data. According to the Secretary, the group which eventually conducted the study concluded that the failure to account for part-time workers was the "most serious deficiency" in the BLS data. In 1986, the Secretary finally revised the index to distinguish between part-time and full-time employees.
 
 
 9
 For the cost years at issue in this case, which were governed by the pre-1986 indices, appellants' costs exceeded the routine cost limits. Each appealed to the Provider Reimbursement Review Board ("PRRB") as required under the Medicare Act, 42 U.S.C. Sec. 1395oo(a). Memorial sought reimbursement for costs in excess of Medicare's routine cost limits. Mt. Diablo requested an order allowing it to go directly to federal court to challenge the cost limits. The PRRB determined that it had no power to determine the validity of the wage index and authorized the parties to seek judicial review in the district court under 42 U.S.C. Sec. 1395oo(f)(1).
 
 
 10
 Memorial and Mt. Diablo filed suit in the district courts in May 1988 and July 1989, respectively. Memorial sought a retroactive corrective adjustment to its reimbursement based on the "errors" in the wage index or, alternatively, an exemption from the routine cost limits on the grounds that the inaccurate wage index was "an extraordinary circumstance beyond its control."[3] Mt. Diablo sought both a declaration that the methodology used in calculating the area wage index was invalid and a retroactive corrective adjustment. The district courts granted the Secretary's motions for summary judgment in each case. Both hospitals timely appealed.
 
 
 11
 In our original Opinion, we affirmed the decision in Memorial Hospitals Association v. Sullivan, No. 90-15857, but reversed and remanded the decision in Mt. Diablo Hospital v. Sullivan, No. 90-15772. In light of the intervening decision in Good Samaritan, --- U.S. ----, 113 S.Ct. 2151, we now affirm the judgment in both cases.
 
 II
 STANDARD OF REVIEW
 
 12
 We review the district court's grant of the Secretary's motion for summary judgment de novo. Vallejo Gen. Hosp. v. Bowen, 851 F.2d 229, 230-31 (9th Cir.1988).
 
 
 13
 The Secretary's Medicare reimbursement policy is reviewed under the Administrative Procedure Act (APA). 42 U.S.C. Sec. 1395oo(f)(1). Under the APA, we must determine if the Secretary's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. Sec. 706(2)(A). In making this determination, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).
 
 III
 ANALYSIS
 A. Retroactive Corrective Adjustments
 
 14
 The Medicare statute, 42 U.S.C. Sec. 1395, requires the Secretary to make "retroactive corrective adjustments" for hospitals whose reimbursement under the cost rules "proves to be either inadequate or excessive." 42 U.S.C. Sec. 1395x(v)(1)(A)(ii). Mt. Diablo and Memorial hospitals seek a retroactive corrective adjustment because they claim that the old cost rules undercompensated them by failing adequately to take into account their labor costs.
 
 
 15
 The statute at issue, 42 U.S.C. Sec. 1395x(v)(1)(A), provides:
 
 
 16
 The reasonable cost of any services ... shall be determined in accordance with regulations establishing the method or methods to be used ... in determining such costs.... Such regulations shall ... (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.
 
 
 17
 On its face, the plain language of the statute appears to require the Secretary to make a retroactive adjustment when the cost method produces an inequitable result in a particular case.
 
 
 18
 In Regents of the University of California v. Heckler, 771 F.2d 1182, 1189 (9th Cir.1985), the Secretary contended that this provision requires "no more than a year-end balancing of the books." We rejected that argument for several reasons, and concluded that hospitals were entitled to seek a retroactive corrective adjustment on the grounds that the cost limits, even though correctly applied, worked an injustice in their particular circumstance. Id. at 1189-91.
 
 
 19
 Subsequently, however, the Supreme Court explicitly approved of the Secretary's "book balancing" approach. See Good Samaritan, --- U.S. at ----, 113 S.Ct. at 2156. Concluding that the language of clause (ii) was ambiguous, the Court held that "[i]n the circumstances of this case, where the agency's interpretation of a statute is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction." Id. at ----, 113 S.Ct. at 2161. The Court noted that "the regulatory framework put in place by the agency in furtherance of the Medicare program supports the book-balancing approach to clause (ii)." Id. at ----, 113 S.Ct. at 2159. Moreover, the Secretary's interpretation was "textually defensible" and comported with Congress' broad delegation of authority to the agency regarding the development of regulatory methods for the estimation of reasonable costs. Id. at ----, 113 S.Ct. at 2162.
 
 The Court concluded:
 
 20
 Though not the sole permissible one, the agency's interpretation of clause (ii), manifested in regulations promulgated soon after enactment and expressed today, "give[s] reasonable content to the statute's textual ambiguities."
 
 
 21
 Id. (internal citation omitted). The Supreme Court has thus rejected our previous interpretation of clause (ii). To the extent that our opinion in Regents conflicts with Good Samaritan, we recognize that the decision in Regents has been overruled.[4]
 
 
 22
 Good Samaritan forecloses any attempt by Mt. Diablo and Memorial to demonstrate that their compensation was inadequate and that they are entitled to a retroactive adjustment awarding them their "reasonable" costs in excess of the limits prescribed by the Secretary.
 
 
 23
 Indeed, and for all practical purposes, petitioners' contention is that the methods chosen by the agency did not take into account sufficient variables.... It is, in all but name, a challenge to the validity of the methods--albeit in an individual case--including the cost limits, the exceptions and the exemptions, and to their adequacy as gauges of reasonable costs. The Secretary has construed the statute to allow such attacks, not via clause (ii), but rather, in keeping with the broad authority with which she is possessed, by way of the arbitrary and capricious provision of the Administrative Procedure Act, 5 U.S.C. Sec. 706.
 
 
 24
 --- U.S. at ----, 113 S.Ct. at 2162. The only route that remains open to Appellants is a direct challenge to the calculation of the cost limits themselves. It is to this challenge that we now turn.
 
 B. Calculation of Cost Limits
 
 25
 Mt. Diablo argues that the pre-1986 method for calculating routine cost limits was arbitrary and capricious for two reasons. First, Mt. Diablo contends that the Secretary ignored a relevant factor--the discrepancies in the wage index caused by regional variations in the use of part-time and full-time employees. Second, it argues that the Secretary failed to respond adequately to public comments on this issue.
 
 
 26
 1. Failure to consider a relevant factor.
 
 
 27
 Mt. Diablo points to three comments on the proposed use of the BLS data as evidence that the Secretary knew about and failed to consider the distortion caused by part-time workers.[5] In 1979, the Hospital Association of New York State (HANYS) commented: "A wage level comparison based upon [the BLS data relating to service workers] can be distorted by the regional variations in mix of part-time employment, hours worked per week, overtime pay, etc." Comments of the Hospital Association of New York State on the Proposed Schedule of Limits on Hospital Inpatient General Routine Operating Costs for Cost Reporting Periods Beginning On Or After July 1, 1979, April 30, 1979, at 2 [hereinafter Comments of HANYS ].[6]
 
 
 28
 In 1980, the Secretary received two additional comments on the wage index. The Hospital Association of Rhode Island advocated use of data from the American Hospital Association (AHA) because of the distortion caused by BLS' failure to account for part-time workers. An accounting firm also noted the impact of the omission, stating that "those areas with a large volume of part-time hospital workers will rate lower than areas with more full-time employment, even though their actual wage scales may be higher."
 
 
 29
 We review agency actions under the APA to determine if the agency has adequately considered all "relevant factors." See Citizens to Preserve Overton Park, 401 U.S. at 416, 91 S.Ct. at 824. An agency rule may be found to be arbitrary and capricious when
 
 
 30
 the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
 
 
 31
 Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).
 
 
 32
 We may conclude that an agency has ignored relevant factors where its action amounts to an " 'artificial narrowing of options' [which] is antithetical to reasoned decisionmaking...." International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 817 (D.C.Cir.1983) (quoting Pillai v. Civil Aeronautics Bd., 485 F.2d 1018, 1027 (D.C.Cir.1973)) (internal citation omitted), cert. denied, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). Agency actions cannot be sustained where the agency has failed to consider significant alternatives. See ILGWU, 722 F.2d at 815-16 (agency failed to consider "substantial testimony" and "specific proposals" for alternative actions). Similarly, an action will not be upheld where the agency has intentionally omitted evidence from consideration or where there is nothing in the record to support the agency's decision. See Pillai, 485 F.2d at 1027; California Hosp. Ass'n v. Schweiker, 559 F.Supp. 110 (C.D.Cal.1982) (in drafting documents supporting a proposal, agency intentionally omitted facts which undermined its position), aff'd, 705 F.2d 466 (9th Cir.1983).
 
 
 33
 Applying these criteria, we cannot conclude that the Secretary acted arbitrarily or capriciously by not factoring the use of part-time workers into the wage index. A relatively insignificant percentage of the comments received during the period leading up to the adoption of the 1981 routine cost limits were directed at the part-time worker issue. Most comments were directed at other concerns, particularly a fundamental change in the reimbursement rate and the proposed methods of classifying care providers. Additionally, the record suggests that, far from intentionally omitting the issue from consideration, the agency recognized the growing concern about the part-time worker issue and planned to address it in a comprehensive manner. Indeed, the agency proposed in 1981 to develop an appropriate database by modifying the Medicare cost report, but the proposal was delayed in part because of opposition from the hospital industry.
 
 
 34
 Moreover, the agency's action was well within the reasonable bounds of its Congressional mandate. The agency was given broad powers to promulgate regulations providing for the determination of the costs of services, including the establishment of limits on costs to be recognized as reasonable. See 42 U.S.C. Sec. 1395x(v)(1)(A). A court must accord an agency's statutory interpretation "substantial deference," since "presumably [the agency] has brought its expertise to bear in formulating the regulation...." American Hosp. Mgmt. Corp. v. Harris, 638 F.2d 1208, 1212 (9th Cir.1981). Review in such a case "is limited to determining whether the regulation is reasonably related to the purpose of the relevant enabling legislation...." Id.
 
 
 35
 Here, Congress recognized that "the initial ceilings will of necessity be imprecise in defining the actual cost of efficiently delivering needed health care.... The data that are available for this purpose will often be less than perfectly reliable...." House Report, supra, at 5070. To forbid the agency from adopting routine cost limits until perfect data concerning a relatively minor issue is developed would contravene the agency's mandate. This is particularly true in the case of part-time workers, since Congress had recognized the need for ongoing refinements and the agency had proposed to remedy the problem.
 
 
 36
 Mt. Diablo also argues that the Secretary should have used AHA data, which was weighted to account for the part-time worker issue, in formulating the wage index. It claims this data was available to the Secretary as early as 1979, and that it was used in calculating other portions of the wage index.
 
 
 37
 The Secretary did not indicate why (or whether) the BLS data was preferable to the AHA data with regard to the part-time worker issue. But "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). That path is evident here. The record indicates that the decision to use the BLS data was based upon a number of factors, including variations in overtime and variations in hospital occupational categories. The agency stated in the June 20, 1980, Federal Register that it did "not bas[e] the wage index on AHA data because these data are less complete than those supplied by the BLS, since they do not include all of the occupational categories comprised by the BLS data base." Medicare Program; Schedule of Limits on Hospital Inpatient General Routine Operating Costs of Cost Reporting Periods Beginning on or after July 1, 1980, 45 Fed.Reg. 41868, 41872 (1980). The agency simply chose one imperfect database over another while seeking to develop data superior to either. This choice was rational. The Secretary concluded that the BLS data were "the most reliable data available" at the time. See Schedule of Limits, supra at 33639. Given the narrow scope of review, we cannot regard the Secretary's decision to use that data as arbitrary and capricious.[7]
 
 
 38
 2. Failure to respond adequately to public comments.
 
 
 39
 Mt. Diablo argues that the routine cost limits are invalid because the Secretary "did not respond specifically" in the Federal Register to comments about the part-time worker issue. The Secretary explained his use of the BLS data only by saying that they were "the most reliable data available." See Schedule of Limits, supra at 33639. Mt. Diablo contends that the Secretary was obligated to explain the reasoning behind that conclusion.
 
 
 40
 A rule may be invalidated under the APA because an agency fails to explain the rule adequately. United States v. Garner, 767 F.2d 104, 117 (5th Cir.1985); see also International Bhd. of Teamsters v. United States, 735 F.2d 1525, 1532 (D.C.Cir.1984) (in absence of "other indication" of why the agency acted as it did, "bald assertion" that reporting items are "unnecessary" cannot be upheld). Nevertheless,
 
 
 41
 [t]here is no obligation to make references in the agency explanation to all the specific issues raised in comments. The agency's explanation must simply enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.
 
 
 42
 South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 886 (4th Cir.1983) (internal citations and quotations omitted), cert. denied, 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984). In making the "keystone" inquiry whether the Secretary "engaged in reasoned decisionmaking," ILGWU, 722 F.2d at 815, the reviewing court is to consider the larger administrative record. 5 U.S.C. Sec. 706.
 
 
 43
 As the preceding discussion explains, the record indicates that the Secretary acted reasonably in formulating the wage index. Moreover, given the fact that the part-time worker issue was of minor significance at the time the wage index was adopted, the Secretary had no obligation to provide a specific response to the comments about it. The Secretary's general response to the concern over the validity of the BLS data was appropriate.
 
 IV
 CONCLUSION
 
 44
 In accordance with the decision in Good Samaritan, --- U.S. ----, 113 S.Ct. 2151, we conclude that the hospitals are not entitled to seek a retroactive adjustment to the wage index to account for the use of part-time workers. We also conclude that the Secretary's method for calculating routine cost limits for Medicare reimbursement was not rendered arbitrary and capricious by the Secretary's failure to account for the use of part-time workers. The decisions of the district courts are AFFIRMED.
 
 
 45
 AFFIRMED.
 
 
 
 *
 Donna E. Shalala is substituted for Louis W. Sullivan, M.D., Secretary of Health and Human Services, pursuant to Fed.R.App.P. 43(c)(1)
 
 
 **
 Donna E. Shalala is substituted for Otis R. Bowen, M.D., Secretary of Health and Human Services, pursuant to Fed.R.App.P. 43(c)(1)
 
 
 [1]
 Memorial challenges the reimbursement it received for the fiscal year ending in 1980. Mt. Diablo challenges its reimbursement for the fiscal years ending in 1982 and 1983
 
 
 [2]
 42 U.S.C. Sec. 1395x(v)(1)(A) states:
 Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs.
 
 
 [3]
 There are two basic mechanisms for the adjustment of cost limits where the general rules do not adequately reimburse the health care provider for its reasonable costs--exemptions and retroactive corrective adjustments. An exemption may be granted where, for example, excess expenses are attributable to provision of atypical services or "extraordinary circumstances." It will be allowed "only if the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the [the fiscal agent of the Secretary]." Hennepin County v. Sullivan, 883 F.2d 85, 87 (D.C.Cir.1989), cert. denied, 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990); 42 C.F.R. Sec. 413.30(e), (f). Memorial does not appeal the denial of its request for an exemption
 
 
 [4]
 In our original opinion, we devoted considerable space to a discussion of whether or not Regents remained good law after the Supreme Court decision in Bowen v. Georgetown University Hospital, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In light of Good Samaritan, however, this discussion is now moot
 
 
 [5]
 Mt. Diablo also points out that in the July 3, 1984, Federal Register the Secretary acknowledged that "the most serious deficiency" of the BLS data was its failure to control for part-time workers. Health Care Financing Administration Addendum--Proposed Schedule of Standardized Amounts Effective with Discharges on or After October 1, 1984, and Update Factors Effective with Cost Reporting Periods Beginning on or After October 1, 1984, 49 Fed.Reg. 27438, 27439 (July 3, 1984). It relies upon the adoption in 1986 of a wage index accounting for part-time workers as further evidence of the rule's arbitrariness. Evidence of subsequent developments, however, is not considered in a review of informal agency rulemaking. Review is limited to the administrative record before the Secretary at the time of the decision. See Citizens to Preserve Overton Park, 401 U.S. at 420, 91 S.Ct. at 825
 
 
 [6]
 However, HANYS also acknowledged:
 [T]here is, at the present time, no data source which is external to the hospital economy that can be used to reasonably adjust the differences between salaries. The development of such data certainly is possible but would involve considerable time, difficulty, and expense to develop.
 Comments of HANYS, at 2.
 
 
 [7]
 The Eighth Circuit reached the same conclusion on similar facts in the Good Samaritan case. See Good Samaritan Hosp. v. Sullivan, 952 F.2d 1017 (8th Cir.1991), aff'd, --- U.S. ----, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). Rural Nebraska hospitals, whose costs exceeded the Secretary's cost schedules, claimed that the wage-index regulations were arbitrary and capricious for failing to account for the use of part-time employees. Like Appellants in this case, the hospitals claimed that the Secretary knew of the distortion but did nothing to correct it. The Eighth Circuit rejected the hospitals' claim, holding:
 At the time the regulations were in place, the Secretary claims that they were based upon the latest available data. There is nothing arbitrary or capricious about the cost limit methodology used by the Secretary. Both the wage index and the rural/urban distinction were based on objective data and regulations, and we hold the SMSA-based cost limit regulations are not arbitrary or capricious.
 Id. at 1025 (citations omitted). The hospitals did not renew these claims on appeal to the Supreme Court. --- U.S. at ----, n. 16, 113 S.Ct. at 2162 n. 16.