**COUNTY OF LOS ANGELES, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**PASADENA HOSPITAL ASSOCIATES, Ltd., Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**ROBERT PACKER HOSPITAL, et al., Plainitffs,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**SUMMIT HOSPITAL CORPORATION, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**UNIVERSAL HEALTH SERVICES, INC., et al., Plaintiffs,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**GALEN MEDICAL CORPORATION, et al., Plaintiffs,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**NU–MED BALDWIN PARK, INC., et al., Plaintiffs,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**CHARTER MEDICAL CORPORATION, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**HOSPITAL CORPORATION OF NORTHWEST, INC., et al., Plaintiffs,**

v.

Donna E. SHALALA, Secretary of Health and Human Services, Defendant.

Civil Action Nos. 93–146 SSH, 93–147 SSH, 93–479 SSH, 93–692 SSH, 93–836 SSH, 93–837 SSH, 93–1188 SSH, 93–2069 SSH and 94–1485 SSH.

United States District Court, District of Columbia.

Jan. 20, 1998.

As Amended Jan. 23, 1998.

David Howard Eisenstat, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for Plaintiffs.

Karen Stewart, Sheila Mae Lieber, Civil Division, Dept. of Justice, Washington, DC, John Deacon Bates, U.S. Attorney's Office, Washington, DC, H. Anthony Lim, Lawrence J. Harder, U.S. Dept. of Health & Human Services, Health Care Financing Division, Baltimore, MD; for Defendant.

## *OPINION*

STANLEY S. HARRIS, District Judge.

This matter is before the Court on defendant's motion for summary judgment, plaintiffs' motion for summary judgment and opposition to defendant's motion, defendant's opposition and reply, and plaintiffs' reply.

Also before the Court are plaintiffs' motion to strike portions of the declaration of Rose Connerton and defendant's opposition thereto. Upon consideration of those motions, the Court enters an Order in accordance with the reasoning set forth below. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule ... 56," the Court nonetheless sets forth its analysis. Fed.R.Civ.P. 52(a).

## BACKGROUND

The Medicare program, established in 1965, provides federally funded health insurance for the elderly and disabled. *See* 42 U.S.C. § 1395 *et seq.* (1988). Until 1983, hospitals were reimbursed based on their "reasonable costs" or "customary charges" for services provided. *Id.* at § 1395f(b). In 1983, in response to escalating Medicare expenditures, Congress revised the system for reimbursing hospitals. The new regime, known as the Prospective Payment System ("PPS"), pays hospitals a fixed, predetermined "prospective payment rate" for each hospital discharge. *Id.* at § 1395ww(d)(1). The prospective rates paid to hospitals for Medicare beneficiaries vary according to the category of illness treated, or "diagnosis related group" ("DRG"). *Id.* at § 1395ww(d). The rate for a DRG is intended to reflect the average resources required to treat cases within that DRG.

When the new PPS system was proposed, public hospitals expressed concern that they would be at a disadvantage because they had sicker than average patients. *See* Hearings Before the Comm. on Ways and Means, H. Hrg. No. 98–3, at 218 (1983). In order to address this problem, Congress provided for additional payments for what are characterized as "outlier" cases, *i.e.*, ones involving an unusually long length of stay ("day outliers") or extraordinarily high cost ("cost outliers").

42 U.S.C. § 1395ww(d)(5)(A); *see also* Hearing Before the Subcomm. on Health of the Senate Comm. on Finance, S. Hrg. 98–60, pt. 1, at 50 (1983). Each year, the Secretary of the United States Department of Health and Human Services ("the Secretary") establishes thresholds for determining when a specific case qualifies as an outlier. 42 U.S.C. § 1395ww(d)(5)(A)(i)–(ii). The statute further provides that the outlier payment "shall approximate the marginal cost of care" beyond the thresholds, and that "the total amount of the additional payments made ... for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year." *Id.* at § 1395ww(d)(5)(A)(iii)–(iv). In order to comply with the statute, each fiscal year ("FY") the Secretary sets the outlier thresholds at a level which she estimates will result in outlier payments being five to six percent of total Medicare payments projected to be made that fiscal year.[1]

In FYs 1985 and 1986, actual outlier payments were less than five percent of total DRG prospective payments.[2] Plaintiffs, the owners of hospitals qualified as Medicare providers, argue that they are entitled to additional outlier payments for FYs 1985 and 1986 because the statute states that actual outlier payments for a fiscal year must represent five to six percent of estimated total Medicare payments for those years. In addition, plaintiffs claim that the manner in which the outlier thresholds were established for FYs 1984 to 1986 was arbitrary and capricious and therefore violated the Administrative Procedure Act. The Secretary, however, adheres to the view that the statute makes no provision for retroactive adjustments to outlier payments if they ultimately diverge

---

1. In FYs 1985 and 1986, at issue here, the outlier thresholds were set at a level which the Secretary projected would result in outlier payments representing the permissible minimum—5.0%—of projected total DRG prospective payments. 49 Fed.Reg. 34728, 34768 (Aug. 31, 1984); 50 Fed.Reg. 35646, 35709 (Sept. 3, 1985).

2. Both parties cited the percentage of actual DRG payments in their briefs, presumably as an

agreed-upon proxy for estimated total payments. In FY 1985, actual outlier payments represented only 3.0% of total DRG prospective payments, and in 1986 actual outlier payments were only 4.4% of total DRG prospective payments. Plaintiffs have agreed that the Secretary met her statutory obligation under 42 U.S.C. § 1395ww(d)(5)(A)(iv) for FYs 1984 and 1987.

from the Secretary's projection, and that her calculation of outlier thresholds was not arbitrary and capricious. *See* Medicare Program; Prospective Payment for Medicare Inpatient Hospital Services, 49 Fed.Reg. 234, 265 (Jan. 3, 1984). As a result, the Secretary refused to award plaintiffs any additional outlier payments. Plaintiffs filed timely appeals of that decision with the Provider Reimbursement Review Board ("PRRB"). The PRRB granted plaintiffs the right to seek expedited judicial review of their claims pursuant to 42 U.S.C. § 1395oo(f). The parties thereafter filed the instant pleadings.

### STANDARD OF REVIEW

Summary judgment may be granted only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### DISCUSSION

**I. Proper Interpretation of Section 1395ww(d)(5)(A)(iv)**

The first issue in the cross-motions for summary judgment is the proper interpretation of 42 U.S.C. § 1395ww(d)(5)(A)(iv), which, as noted above, provides that "[t]he total amount of the additional payments made ... for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year." The Secretary argues that this language merely requires her to set outlier thresholds at a level projected to result ·in outlier payments in the five to six percent range. Plaintiffs claim that the statute requires that actual outlier payments made fall in the range. If the payments do not, plaintiffs contend that the Secretary is required to make retroactive payments to meet the statute's requirement.

■ This Court's review of the Secretary's interpretation of § 1395ww(d)(5)(A)(iv) is governed by the two-step analysis set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> First ... is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–843. The precise question in this case is whether § 1395ww(d)(5)(A)(iv) requires the Secretary to make retroactive adjustments to outlier payments when the total outlier payments for a fiscal year turn out to be less than five percent (or more than six percent) of the total payments estimated to be made for that year.

■ The starting point in statutory interpretation is the language of the statute itself. *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *Ardestani v. I.N.S.*, 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991). The plain language of a statute must be read together with its surrounding sections, since "the meaning of statutory language, plain or not, depends on context." *Conroy v. Aniskoff*, 507 U.S. 511, 515, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993); *see also Davis v. Michigan Dep't of Treas.*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

■ Section 1395ww(d)(5)(A)(iv) states that the "total amount of the additional [outlier] payments made ... may not be less than 5 percent nor more than 6 percent of

the total payment projected or estimated to be made ... in that year." The Court finds no ambiguous wording in subsection (iv) that is susceptible to more than one meaning. The statute does not say that the "total amount of payments estimated to be made" must be within the five to six percent range, which is the interpretation proffered by the Secretary. "Projected or estimated" does not modify "total amount of additional payments," it only modifies "total payment" at the end of the subsection. *See id.*

Defendant argues that even though the text of the statute supports plaintiffs' position in isolation, when subsection (iv) is read literally it is inconsistent with its surrounding subsections, leading to ambiguity and absurd results. *See Public Citizen v. United States Dept. of Justice,* 491 U.S. 440, 455, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) ("Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom."). Specifically, defendant argues that it is impossible to comply with both §§ 1395ww(d)(5)(A)(iii) and (iv) if the text of subsection (iv) is given its literal meaning.[3]

The Court cannot agree with defendant's contention. The statute as written does not give rise to inconsistent or absurd results. A natural reading of the related subsections reveals a clear structure pursuant to which the Secretary is supposed to disburse outlier payments. At the beginning of a fiscal year, the Secretary, in her discretion, establishes the "fixed" thresholds, above which a hospital discharge qualifies as an "outlier." *See* 42 U.S.C. § 1395ww(d)(5)(A)(i)–(ii). The Secretary is directed to use the approximate marginal cost of care beyond the threshold as a guideline for the outlier payments she approves during the year. *See id.* at § 1395ww(d)(5)(A)(iii). However, once the total additional payments have been made for the year, the Secretary is instructed to ensure that they are "not ... less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made ... for discharges in that year." *Id.* at § 1395ww(d)(5)(A)(iv). There is nothing illogical or absurd about initially setting outlier payments at marginal cost and then, when actual outlier data is known, adjusting the final payments to ensure that the Secretary has met her statutory obligation to the providers.

The overall statutory structure fully supports the plain meaning of subsection (iv) and negates any possible ambiguity. *See Estate of Cowart,* 505 U.S. at 477. Subsection (iv) is at the end of the sequence, indicating that it is to be a final limitation on the Secretary's discretion, not an initial step as the Secretary contends. The inconsistency which the Secretary claims exists between subsections (iii) and (iv) is removed by the text of subsection (iii), which requires only that "the amount of such additional payment *under clauses (i) and (ii)* ... shall ... approximate the marginal cost of care." *Id.* at § 1395ww(d)(5)(A)(iii) (emphasis added). Subsection (iii) does not say that the final adjustments under subsection (iv) must conform to the marginal cost guidelines.[4]

---

3. Subsections 1395ww(d)(5)(A)(i)–(iv) provide, in relevant part:

  (i) ... [T]he Secretary shall provide for an additional payment for a subsection (d) hospital for any discharge in a diagnosis-related group, the length of stay of which exceed the mean length of stay for discharges within that group by a fixed number of days, or exceeds such mean length of stay by some fixed number of standard deviations, whichever is the fewer number of days.
  (ii) For cases which are not included in clause (i), a subsection (d) hospital may request additional payments in any case where charges ... exceed a fixed multiple of the applicable DRG prospective payment rate, or exceed such other fixed dollar amount, whichever is greater....

  (iii) The amount of such additional payment under clauses (i) and (ii) shall be determined by the Secretary and shall ... approximate the marginal cost of care beyond the cutoff point applicable under clause (i) or (ii).
  (iv) The total amount of the additional payments made under this subparagraph for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year.

4. Defendant contends that the word "fixed" in subsections (i) and (ii) means that Congress intended the outlier payments for the year to be "fixed" once made. The statute, however, only states that outlier thresholds must be determined in reference to a fixed number. It does not say

Moreover, statutes must be read so that "all parts of [the] statute, if possible, are . . . given effect." *Fidelity Federal Savings and Loan Ass'n v. Cuesta*, 458 U.S. 141, 163, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (internal quotation omitted); *see also United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *National Soft Drink Ass'n v. Block*, 721 F.2d 1348, 1352 (D.C.Cir. 1983). Plaintiffs' literal reading of the Medicare statute gives effect to every word. Subsection (iii) is given effect as a guideline, and subsection (iv) is given effect as a limitation on the Secretary's discretion. *See* 42 U.S.C. § 1395ww(d)(5)(A)(iii)–(iv). The Secretary's interpretation, on the other hand, ignores Congress' choice of the word "made" as a verb for "total additional payments" and would require the Court to assume Congress meant "estimated total additional payments," in contrast to the actual text of the statute. The only way to give effect to every clause and word of the statute, therefore, is to adopt the plain meaning of the text proposed by plaintiffs.[5]

■ Finally, defendant argues that the literal language of the statute should be ignored because it conflicts with the legislative history and purpose of the Medicare prospective payment system. The strong presumption that the plain language of the statute expresses congressional intent is rebutted "only in 'rare and exceptional circumstances' . . . when a contrary legislative intent is clearly expressed." *Ardestani*, 502 U.S. at 135–36 (quoting *Rubin v. United States*, 449

U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)); *see also Estate of Cowart*, 505 U.S. at 475 ("[W]hen a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (plain language only ignored "in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of the drafters") (internal quotation omitted).

In this case, there is no clear statement in the legislative history indicating Congress intended § 1395ww(d)(5)(A)(iv) to have any meaning other than what it states on its face.[6] Nor is a literal reading of § 1395ww(d)(5)(A)(iv) so contrary to the purpose of the Medicare statute as to allow the Court to ignore the text. The Secretary argues that retroactive adjustments to outlier payments would be inconsistent with the nature of the prospective payment mechanism, which provides a fixed rate for hospital discharges, unaffected by a hospital's practices. Plaintiffs respond that retrospective adjustments of outlier payments are not inconsistent with the statutory scheme because they are, by nature, outside the "prospective" part of the Medicare system.

Defendant relies heavily on our court of appeals' decision in *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225 (D.C.Cir. 1994), in her argument that a retroactive adjustment to outlier payments would be at

---

that a payment for a discharge beyond that fixed threshold (an outlier) must remain unchanged. *See* 42 U.S.C. § 1395ww(d)(5)(A)(i)–(ii).

**5.** The Court does not dispute that the literal language of the statute, requiring the Secretary to adjust outlier payments retrospectively, would necessitate additional work. It may be unusual that Congress would base the range for outlier payments on "projected or estimated" total Medicare payments for a year, not actual payments. It does not, however, lead to a result "so absurd or illogical that Congress could not have intended it." *Conroy*, 507 U.S. at 516. Congress may have decided to use "projected or estimated" total payments for the year as a range in order to promote certainty, so the Secretary would know, at the beginning of the fiscal year, the maximum amount which she would have to allocate to outlier payments. This is a reason-

able policy decision, considering the inherent uncertainty of outliers.

**6.** Defendant argues that a Senate report which states that "[t]otal expected payments" under the statutory scheme "will be not less than 5 percent, nor more than 6 percent, of total Medicare payments" provides the legislative intent which somehow should compel the Court to ignore the plain language of the statute. *See* S.Rep.No. 98–23, at 51 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 191. The context of the report indicates, however, that the word "expected" was used because the report is discussing the Medicare plan in the future tense. *See id.* This single use of the word "expected," though perhaps fortuitous for defendant, is not sufficient to overcome the plain meaning of the statute. *See Ardestani*, 502 U.S. at 135–36.

odds with the prospective nature of the Medicare statute. In *Methodist Hospital*, the Secretary realized that a regional wage index used to compute DRG rates had been erroneously calculated for several years, but refused to retrospectively apply the adjusted rate to alter the DRG rates for those years. *Id.* at 1226. Several hospitals appealed that decision, arguing that the Medicare statute required the Secretary to give retroactive effect to wage index corrections. *Id.* The D.C. Circuit upheld the Secretary, noting that Congress had given the Secretary discretion to compute wage indexes and that, due to the prospective nature of the Medicare system, a retrospective adjustment in such a circumstance would "cause a significant, if not debilitating, disruption to the Secretary's administration of the already-complex Medicare program." *Id.* at 1233.

The *Methodist Hospital* decision does not, however, control this case. The Secretary was given total discretion under the Medicare statute to develop the wage index which was at issue in *Methodist Hospital. Id.* at 1230. Section 1395ww(d)(5)(A)(iv), on the other hand, is a limit on the Secretary's discretion in making outlier payments. Moreover, the wage index in *Methodist Hospital* was a component of the DRG rates, meaning that a change in the wage index "could [have] affect[ed] the payment rates applicable for each hospital discharge under PPS that year," severely interfering with the prospective nature of the system. *Methodist Hospital*, 38 F.3d at 1233. In contrast, a retroactive adjustment in this case would only affect outlier payments made in a particular year. It would not affect the core of the prospective payment system, the DRG rates.[7]

The Secretary's argument that retrospective adjustments to outlier payments are inconsistent with the Medicare statute is particularly weak considering the simple fact

that outlier payments are an exception to the prospective nature of the Medicare system. Outlier payments were developed to shield hospitals from unusually costly or lengthy hospital discharges which otherwise would warrant just the standard DRG rate. *See* Senate Hearing 98–60, *supra.*, at 50. DRG standard rates are set prospectively so that hospitals "receive advance notice of the rates at which their services will be reimbursed." *Methodist Hospital*, 38 F.3d at 1227. In contrast, outlier payments depend on the severity of the particular case, which cannot be known until the patient is discharged. Indeed, the Secretary has noted that outlier payments are "additional payments ... in recognition of the existence of certain conditions beyond the scope of ... PPS." 1984 Ann.Rep., Impact of the Medicare Hospital Prospective Payment System, HCFA Pub. No. 03231, at 2–23 [hereinafter "1984 Ann. Rep."].

▬ This case is far more similar to *Georgetown Univ. Hosp. v. Bowen*, 862 F.2d 323 (D.C.Cir.1988), where our court of appeals allowed retrospective adjustments to payments made to hospitals during the years when the "reasonable cost" system was being replaced by the PPS system. *Georgetown*, 862 F.2d at 323–324. In that case, the Secretary also argued that retrospective adjustments would be inconsistent with the prospective nature of the Medicare system. *Id.* at 327. The D.C. Circuit, however, noted that the Secretary's "prospective" argument was not persuasive because Congress had expressly provided for a phase-in period, during which time the system was not totally prospective. *Id.* Similarly, the Secretary's "prospective" argument does not carry much weight in this case, since "outlier" payments are an exception to the otherwise strict prospective nature of the Medicare system. *See* 1984 Ann.Rep. at 2–23.[8]

7. Defendant argues that a retroactive change in actual outlier payments made would affect DRG rates because the outlier thresholds would have to be changed so outlier payments could both fall in the range required by subsection (iv) and approximate marginal cost as required in subsection (iii). As explained previously, this is not what the statute requires. Thus, there is no reason why outlier thresholds would be affected

by retrospective outlier payment adjustments, and hence no reason why DRG rates themselves would ever have to be retrospectively adjusted.

8. Because the language of the statute is unambiguous, the Court need not address the reasonableness of the Secretary's interpretation under the second step of *Chevron* or the statute's legislative history. Those issues are only relevant if the

## II. The Secretary's Outlier Threshold Calculations and the Administrative Procedure Act

Plaintiffs further contend that the manner in which the outlier thresholds were established for fiscal years 1984 through 1986 violated the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 701 *et seq.* At Issue is the Secretary's decision to use data from the 1981 MEDPAR file, a database containing patient specific data for a random sample of 20 percent of all Medicare hospital discharges occurring during 1981, to set outlier thresholds for the relevant fiscal years. Plaintiffs contend that the Secretary abused her discretion by using the 1981 MEDPAR data, collected when Medicare used a "reasonable cost" reimbursement method, without taking into account the likelihood that the average length of stay would decrease under the new PPS system. The Secretary claims that her decision to use the unadjusted 1981 MEDPAR data was a reasonable choice between imperfect databases after consideration of all relevant factors, and thus fully within her discretion.

■ Under the APA, an agency's decision may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto., Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). As the Supreme Court has stated:

> Normally, an agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise.

*Motor Vehicle,* 463 U.S. at 43. An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Though a reviewing court "may not supply a reasoned basis for [an] agency's action that the agency itself has not given," a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

■ The Secretary's decision to use 1981 MEDPAR data for setting outlier thresholds in FYs 1984 and 1985 meets this "arbitrary and capricious" standard.[9] The administrative record for FY 1984 shows that the Secretary recognized there was a chance that the length of stay might decrease under the new prospective system. 49 Fed.Reg. 234, 304 (Jan. 3, 1984). The Secretary noted, however, that "we cannot model or predict exactly how large these opportunities and future changes may be." *Id.* at 303. As a result, the Secretary still considered the 1981 MEDPAR data to be the "best available data" for the FY 1984 calculations. *Id.* at 260. Although the Secretary never specifically addressed outlier thresholds, the Secretary did state generally that "no adjustments [were made] to either the adjusted standardized amounts or to the budget neutrality estimates for conditions that could not be quantified on the basis of currently available data, even if there were a likelihood that these conditions might exist under prospective payment." *Id.* at 255. Thus, the record

---

statute is not clear on its face. *Chevron,* 467 U.S. at 842–43; *Georgetown,* 862 F.2d at 330 (Mikva, J., concurring). In addition, the Court need not address defendant's claim that Congress has acquiesced in the Secretary's interpretation of the statute, since "where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction." *Brown v. Gardner,* 513 U.S. 115, 121, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (quoting *Demarest v. Man-*

*speaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991)).

9. Plaintiffs' challenge to outlier thresholds in FY 1986 is limited to the first seven months of FY 1986, when the FY 1985 thresholds were still in effect. The propriety of the challenged FY 1986 thresholds, therefore, depends entirely on the FY 1985 thresholds, so the Court does not address FY 1986 separately.

demonstrates that the Secretary did not "fail to consider" the possibility of a decrease in length of stay when deciding which data to use for calculating outlier thresholds in FY 1984.[10]

■ Plaintiffs contend that even if the FY 1984 decision was not arbitrary and capricious, the Secretary's failure to use adjusted data in FY 1985 calculations was improper because at that time the Secretary had access to data concerning approximately 2.5 million Medicare discharges that occurred during the early part of FY 1984 (after PPS became effective). Plaintiffs contend that the FY 1985 outlier thresholds were arbitrary and capricious because: (1) the administrative record from FY 1985 does not mention outlier payments, indicating that the Secretary did not consider the issue at all, and (2) even if she did consider both database options, the Secretary's choice of the 1981 MEDPAR data was irrational.

■ Though a rule may be invalidated under the APA because an agency fails to explain the rule adequately under the "notice and comment" rulemaking requirements,

> [t]here is no obligation to make references in the agency explanation to all the specific issues raised in comments. The agency's explanation must simply enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.

*State of South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 886 (4th Cir.1983) (internal citations omitted), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984); *see also United Mine Workers of America, Int'l Union v. Dole,* 870 F.2d 662, 666 (D.C.Cir.1989) (regulatory statements "need not be an exhaustive, detailed account of every aspect of the rulemaking proceedings") (internal quotation omitted); *Mt. Diablo Hosp. v. Shalala,* 3 F.3d 1226, 1234 (9th Cir.1993). The "keystone" inquiry is whether the Secretary "engaged in reasoned decisionmaking." *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C.Cir.1983); *Mt. Diablo,* 3 F.3d at 1234. This Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp.,* 419 U.S. at 286.

■ The record before the Court shows that the Secretary did consider the possibility of using the limited FY 1984 data to calculate outlier payments for 1985, but rejected the idea because of concerns about the data's reliability. The declaration of Rose Connerton, an employee of the Department of Health and Human Services who was directly involved in the development of regulatory criteria that governed the computation of outlier payments during FYs 1984 to 1986, explains that the FY 1984 data were "not representative of a full year's set of prospective payment cases both because the fiscal year was not yet concluded and because most hospitals did not become subject to PPS until after the fiscal year began." Connerton Decl. ¶ 15. The Secretary did not rely on the FY 1984 data because the "use of the data would have skewed the resulting outlier calculations by potentially introducing biases based upon regional hospital practice patterns, the types of hospitals included (particularly the lack of cases treated by teaching hospitals), and seasonal factors (since much of the data related to illnesses treated in the winter months.)"[11] *Id.*

---

10. Plaintiffs further argue that the Secretary's decision to use the 1981 MEDPAR data was not rational because she could have adjusted the data to compensate for a decreased length of stay based on the results of a New Jersey demonstration using a DRG-based prospective payment system similar to PPS. Such an adjustment, however, could easily have overcompensated for the decrease in the length of stay. Given the narrow scope of review, it cannot be said that the Secretary's decision to choose one imperfect database over another was arbitrary and capricious. *See Mt. Diablo Hosp. v. Shalala,* 3 F.3d 1226, 1233 (9th Cir.1993).

11. Plaintiffs argue that this paragraph, among others in the Connerton declaration, should be stricken from the record as post-hoc rationalizations which may not properly be considered by a reviewing court. Though review of an agency decision pursuant to the APA typically is confined to the administrative record, extra-record evidence may be considered to explain the record in cases involving complex subject matter or to ascertain whether the agency properly considered all relevant factors. *See Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on*

An overview of the entire administrative record supports this description of the Secretary's contemporaneous reasoning and indicates that the use of pre-PPS data to project outlier payments early in the "prospective payment" era was part of a calculated decision regarding the most reliable data to be used in projections. Before FY 1986, the Secretary was asked on the record about her decision to use pre-PPS data rather than FY 1984 data to calculate the DRG relative weights for FY 1986. The Secretary explained that "the disadvantages of recalibrating using only the prospective payment system bills outweigh the advantages," since the low volume of cases available to make the calculations was likely to skew the projections due to seasonal effects. 50 Fed.Reg. 35646, 35654 (Sept. 3, 1985). Though the rulemaking record from 1984 does not mention the Secretary's reasons for using the 1981 MEDPAR data to calculate outlier thresholds, the entire administrative record and the additional material properly before this Court are sufficient to "reasonably discern[ ]" that the Secretary considered using FY 1984 data, but did not because of concerns about their reliability. *See Bowman Transp.*, 419 U.S. at 286 (reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). As such, the Secretary's use of the 1981 MEDPAR data in FY 1985 to set outlier payments was a rational choice between two imperfect databases, and was not arbitrary and capricious.[12] *See Mt. Diablo*, 3 F.3d at 1233.

## CONCLUSION

The language of 42 U.S.C. § 1395ww(d)(5)(A)(iv) clearly requires that the total outlier payments made in a particular year fall between five and six percent of the total payments projected or estimated to be made for discharges in that year. The Secretary, therefore, violated her statutory duty in years in which the total outlier payments made did not fall within the mandated range and in which she refused to make retroactive payments to comply with the statute. The Secretary did not act in an arbitrary and capricious manner, however, in deciding to use 1981 MEDPAR data to calculate outlier thresholds for fiscal years 1984 through 1986.

For all the foregoing reasons, plaintiffs' motion for summary judgment is granted in part and denied in part, defendant's motion for summary judgment is granted in part and denied in part, and plaintiffs' motion to strike portions of the Rose Connerton declaration is denied.

---

other grounds, *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *AT & T Info. Systems, Inc. v. General Servs. Admin.*, 810 F.2d 1233, 1236 (D.C.Cir.1987) (per curiam); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284–85 (D.C.Cir.1981). Additional background information or evidence about whether all relevant factors were examined by the agency is permissible so long as the additional material does not "offer post-hoc rationalizations where no rationalization exists." *AT & T*, 810 F.2d at 1236. The Medicare statute is certainly complex subject matter, and the Connerton declaration was offered to clarify that the agency did in fact consider all relevant factors in making its decision. *See Methodist Hosp.*, 38 F.3d at 1227. The declaration is "merely explanatory of the original record and . . . contain[s] no new rationalizations." *Costle*, 657 F.2d at 285. In particular, paragraph 15 is not a rationalization made solely for the purposes of litigation, since the same rationale was proffered in 1985 in response to a comment on the record regarding the Secretary's reasons for not recalibrating

DRG rates based on post-PPS data. *See* 50 Fed. Reg. 35646, 35654 (Sept. 3, 1985).

**12.** Plaintiffs argue that the Secretary's rationale is "so implausible that it [can]not be ascribed to a difference in view or the product of agency expertise," because the FY 1984 data were used in 1985 to make other nationwide adjustments. *Motor Vehicle*, 463 U.S. at 43. The fact that the data were sufficiently reliable for nationwide, aggregate adjustments does not mean, however, that they provided an appropriate database for calculating outlier thresholds. To establish outlier thresholds, the Secretary must compute a standard deviation for each DRG. The Secretary cannot rely on general aggregate information concerning hospital lengths of stay for such a calculation; rather, she must have information relating to the mean length of stay for each DRG. The fact that the Secretary used FY 1984 data for nationwide adjustments does not, therefore, mean that the decision to use 1981 MEDPAR data for outlier thresholds was irrational.